## UNITED STATES v. CARROLL.

### No. 18189.

United States District Court
W. D. Missouri, W. D.
Jan. 7, 1954.

Edward L. Scheufler, U. S. Atty., Horace W. Kimbrell, Asst. U. S. Atty., Kansas City, Mo., for plaintiff.

Morris A. Shenker, St. Louis, Mo., for defendant.

DUNCAN, District Judge.

On December 14, 1951, an indictment in three counts was returned against the defendant, charging him with violating Section 147(a), Title 26 U.S.C.A. and the regulations issued pursuant thereto. The counts referred to the calendar years 1948–1949–1950.

The first count charged the defendant with having failed to report 45 payments in excess of $600 each to designated persons during the calendar year 1948; the second count 36 payments in excess of $600 each for the calendar year 1949; and the third count 20 payments in excess of $600 each for the calendar year 1950. The names of many of the persons receiving payment were identical in each of the three counts. The statute, § 147a, provides that:

"All persons, in whatever capacity acting, including lessees or mortgagors of real or personal property, fiduciaries, and employers, making payment to another person, of rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable gains, profits, and income (other than payments described in section 148(a) or 149), of $600 or more in any taxable year, or, in the case of such payments made by the

United States, the officers or employees of the United States having information as to such payments and required to make returns in regard thereto by the regulations hereinafter provided for, shall render a true and accurate return to the Commissioner, under such regulations and in such form and manner and to such extent as may be prescribed by him with the approval of the Secretary, setting forth the amount of such gains, profits, and income, and the name and address of the recipient of such payment."

The amount of $600 first appears in the 1948 amendment which became effective April 2, 1948, and was amendatory of an Act, in identical language as appeared in the statute theretofore, except as to the amount, which was $500 instead of $600.

The first count for the year 1948 was dismissed upon motion of the defendant. The second count of the indictment charged:

"That during the calendar year 1949, James J. Carroll, who was a resident of the City of St. Louis, State of Missouri, made the following payments to the following persons: * * *"

then it recited the name and address of such person and the amount paid, and concluded with the language:

"* * * and that under the provisions of Section 147 of the Internal Revenue Code and Treasury Regulations 111, Section 29.147–1, as amended, the said James J. Carroll was required on or before February 15, 1950, to make a return on United States Treasury Department Internal Revenue Service Form 1096, to the Commissioner of Internal Revenue, Processing Division, C. C. Station, Kansas City 2, Missouri, setting forth the number of returns on Form 1099 attached thereto; that, well knowing all of the foregoing facts, the said James J. Carroll did willfully and knowingly fail to make said return, Form 1096, to said Commissioner of Internal Revenue or to any other proper officer of the United States at the said time and place.

"In violation of Section 145(a), Internal Revenue Code; 26 U.S.C. Section 145(a)."

The regulations issued pursuant to the authority of this section are found in Reg. 111 and the amendments thereto—Fed.Reg.Vol. 8, P. 17259; and Fed.Reg. 13, P. 6298–9—the last amendment appearing in Par. 33, Sec. 29.147–1–(A) (B) (C) and Par. 34, Sec. 29.147–2. Paragraphs (B) and (C) are:

"(B)  By striking out the first sentence and inserting in lieu thereof the following: 'All persons making payments to another person of fixed or determinable income of $500 or more in any calendar year prior to 1948, and all persons making payment to another person of such income of $600 or more in any calendar year after 1947 must render a return thereof for such year on or before February 15 of the following year except as specified in §§ 29.147–3 to 29.147–5.

"(C)  By striking from the third sentence '260 East 161st Street, New York 51, N. Y.' and inserting in lieu thereof 'C. C.' Station, Kansas City 2, Missouri.'"

The third count for the year 1950 was in identical language, except as to the names and addresses of the persons to whom payments were made, and the amounts.

The case came on for trial on October 12, 1953. At the close of the Government's case, the defendant declined to offer any evidence, and filed a Motion for Judgment of Acquittal, which was taken under consideration by the court, and the case submitted to the jury, resulting in a verdict of "Guilty" on Count II for 1949 and "Not Guilty" on Count III for the year 1950.

All of the transactions involved were in connection with the operation of gambling establishments—one the Maryland

Book Shop located in East St. Louis, Illinois, operated by Jno. Mooney, and the other the Hawthorne Book Shop located in St. Louis, Missouri, operated by Michael Grady.

There is no issue of failure to pay any tax involved here. The returns required by the statute and the regulations issued pursuant thereto are purely for informational purposes, and no other. They are intended to afford the Bureau information concerning income of persons other than the ones required to make the returns, and are required to be filed 30 days before income tax returns are due to be filed. Hundreds of checks representing payments to many persons were received in evidence. Out of that great number only four were actually signed by the defendant, and one of those, (as will be discussed later) was not included in the indictment.

It was the contention of the Government throughout the case that the defendant owned and operated the gambling establishments, and under the law, was charged with the responsibility of making returns, although he had actually and physically not made the payments to the persons named therein. This was the sole factual issue for determination by the jury.

Considering the evidence on both counts was practically the same, it is not quite clear how the jury could have found the defendant guilty on one count and not on the other.

The total transactions of the establishments were of very considerable magnitude—their operations in receiving bets on horse races and other types of sporting events, ran into the millions. Many of the bets were made by telephone, others by persons who were present and deposited the amount to cover their bets. The bettors were of two general types, the betting public who made bets direct, and operators of gambling establishments elsewhere throughout the country who received bets from individual bettors and "laid them off" with either the Maryland or the Hawthorne Book Shop.

In most instances however, these transactions were with the Maryland Book Shop which occupied an upstairs room of a building on Missouri Avenue in East St. Louis, Illinois, and employed 30 or 40 people, including bookkeepers, telephone operators, stenographers and other types of clerical help which would be required in the conduct of such an establishment. Its operation was nation-wide.

There was no denial or dispute of the fact that Carroll was recognized as a gambling commissioner and one whose expert knowledge was sought in fixing odds on horse races and other types of sporting events. He spent a considerable portion of his time around the Maryland Book Shop, but would also be away for long periods—several months at a time. He had a personal acquaintance with many of the persons who made bets through that establishment.

In addition to the individual or occasional bettor and the professional bettor who "laid off" his bets with the St. Louis establishment, there were two types of bets made both by the individual or occasional gambler and the professional gamblers. In some instances credit had been established, and when it was desired to either place a bet or lay off a bet, it would be done by telephone, and no money was actually deposited. With that kind of bet, if there was a loss, the person who was making the bet would remit the amount of the bet to the establishment; if he won, the establishment paid off to him whatever the amount of his winnings may have been.

The same was true of some of the non-professional gamblers; they called on the telephone and if their credit was good, the bet was accepted; if they were unlucky and their horse or their team did not win, they would remit the amount of their bet to the establishment; if they did win, the amount of their winnings was transmitted.

The second type of transaction involved the bettor who made a bet and actually put up the money, whether it was the professional or the non-profes-

sional. If he won, the amount which he had bet, together with the amount of his profit was transmitted to him; if he did not win, there was no further transaction between the parties.

All transactions were conducted on a daily basis and remittances were made daily. This statement is important in view of the court's construction of the statute, which will be discussed later. Most of the transactions were made either by telephone or telegraph. Apparently comparatively few of the persons whose names appear in the indictment were present at the time the bet was actually made and the time the pay-off was made.

The books and records of the establishments were destroyed at the end of each month to avoid seizure in any prosecution under the laws of the state in which the operations took place.

This case was inherited by the District Attorney from a former administration. Mr. Kimbrell, the Assistant District Attorney who tried the case did an unusually fine job of presenting it. In most instances it was necessary for the Government to use witnesses who were unfriendly or reluctant to testify because of the nature of the transactions. Due to the destruction of the original records, it was necessary to resort to the use of secondary evidence, some of which was shown by the recording of the checks on the bank's recordak, which showed only one side of the check and not the endorsements. For that reason it was difficult to properly identify the checks in many instances, and definitely determine whether or not they bore the endorsements of the payees.

While the defendant did not take the stand to testify, it was the contention of his counsel throughout the trial that the defendant did not conduct the business; that he did not have control of the books of the establishments; that he had no knowledge of the persons who made bets or to whom payments were made or the amounts thereof, or whether they represented profit or emoluments; that he made no payments which were required to be reported, and therefore, could not have been liable for failure to do so. Several witnesses testified that they probably gave Carroll checks with which to make bets, but if there was a pay-off, it came from Mooney.

The evidence clearly showed that five persons were authorized to sign checks on the bank accounts out of which the payments were made, and that the defendant was not one of those persons, and in no instance does his name appear on any check that was drawn upon the account of either of the betting establishments.

A great deal of evidence was admitted concerning the relationship of the defendant to the establishments, his presence about the places, his conversations with persons who had dealings with the establishments, solely for the purpose of showing his interest, if any, therein, and his responsibility for their operation.

The first witness for the Government was Maurice Ryan, who identified himself as a professional gambler. He testified that he had not met the defendant prior to the time of the trial; that he had made certain bets in St. Louis, all on horses (probably 30) and all confined to the year 1949, by calling a certain telephone number; that he usually talked to a man by the name of McBurney, who was identified as an employee of the Maryland Book Shop.

The indictment charges two transactions to Ryan, one for the year 1949 in the sum of $36,330 and the other for 1950 in the amount of $4270, although the witness testified that he was not in business in 1950. At any rate, we are not concerned here with any transactions in 1950, but only for 1949. When he placed his bets he always called for McBurney; this practice had been going on for a period of eight or ten years, although he had actually been dealing with the establishments for approximately fifteen years.

Photostats of three checks were received in evidence, over the objection of the defendant. They were drawn on the Mercantile Commerce Trust Company,

made payable to "Maury" A. Ryan—and signed by defendant. They bore dates of March 15, 1949 in the sum of $1500;— April 26, 1949 $500 and May 3, 1949 $200. In response to a question "Did you receive them?" the witness replied: "I would believe I did but I wouldn't be certain because my endorsement is not on them."

The witness testified that he kept daily records of his gambling transactions with the St. Louis establishment, and that these three checks bearing the name of Carroll did not appear in his daily record; that he has no doubt that he received them. In view of the fact that they had not been endorsed by him, and that they were not in his record, he had no definite recollection of them. The court admitted these checks over the objection of the defendant largely because the records showed that they had gone through the bank. There was not a scintilla of evidence as to what the checks were for, or whether they came within the definition of payments required to be reported by the statute.

There is no evidence showing that they represented "gains, profits, and income." So far as the record shows they could have represented the *return* of money as well as gains or profit. If they did represent gains or profits and income, there is no evidence to show the amount equalled $600. Such evidence was not only insufficient to sustain a verdict of guilty, but likewise was of doubtful value for any purpose—about the most favorable thing that may be said for it is that the checks were made payable to one gambler and signed by another gambler. Common knowledge tells us that persons engaged in that "profession" have many dealings of a financial nature which do not represent "profit and gains" or "income."

In all of the other transactions between this witness and the Maryland Book Shop, payments were made by that establishment and the checks were drawn on The First National Bank of East St. Louis. They bore the printed name of "Jno. Mooney 822 Pine St." and the printed signature "Jno. Mooney, Special Account, By ——————," and were signed by persons who were authorized to sign them.

Section 147 has been the law since 1916. It has never been construed by an appellate court.

■ It was admitted that only one other case, and that of a minor nature, had been brought under its provisions. In fact, it has been so universally disregarded by both the taxpayer and the tax collectors, that great numbers of persons did not know of its existence. That of course, does not justify its violation or affect the guilt of one who violates it.

During the trial the court was not aided by any authority as to the meaning of the statute. The Government contended that every payment of $600 or more, insofar as this case was concerned, was required to be reported under the statute and the regulations.

■ The defendant contended that it was only necessary to report profits at the end of the year, if there were any. The court agreed with neither contention, and concluded that the statute meant that all payments of $600 or more in any year involving *rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments* or other *fixed* or *determinable gains* or *profits* were required to be reported, and that the return of money left for investment for wagering did not have to be reported; such payments would be the return of the payee's investment. The amount wagered would be in the nature of a capital investment and the amount realized, if any, would be a gain upon that investment.

If one laid a bet of $400 and won $200, he would receive a payment of $600, but $400 of that amount would be the return of his own money, and would in no sense represent gain or profit or emoluments or any of the other things defined in the statute, but if he had laid the same bet of $400 and had won $1000, then $600 of it would represent profit and gain.

Viewing the statute in this light in its application to the nature of the business involved here, it required that reports of each payment of $600 or more involving "gain or profit" and "income" be made, and also if the aggregate of all payments made during the taxable or calendar year equalled $600 or more in "gains, profits and income" although no single payment equalled $600, a report was also required.

We are confronted here with a very unusual and peculiar type of business, where every day's business became a closed transaction and final so far as the parties were concerned. At the conclusion of the event upon which the wager had been placed, the books were closed, and if a "pay-off" was due, it was made then.

The statute says—"in any taxable year"—the regulation says—"in any calendar year." The difference between the statute and the regulation is not important here. We are treating it on a calendar year basis. If any person shall make payment of $600 or more in "fixed or determinable gains, profits and income," during a taxable or calendar year, to any person he is required to report it. Whether or not such amount so paid shall represent gains and profits or income upon which a tax may finally be exacted, is not a question for determination by the payor. That question must be determined as between the payee and the Collector of Revenue.

The question the payor must determine is whether or not such amount represents gains, profits or income insofar as the relations between him and the payee are concerned.

Thus, considering the Ryan evidence in the light of the construction I have placed upon the statute, there is a complete failure of proof showing any responsibility upon Carroll to report the payments made to Ryan.

We next come to the testimony referred to earlier in this memorandum concerning the payment of the bet that was never placed. We shall refrain from using the name of the witness in this memorandum. To do so would not add to it—he was a business man of responsibility and only an occasional "horse player,"—a weakness apparently not limited to professionals. He testified that he met Carroll on two occasions—one before the almost fatal attempt to lay a bet on the '49 Kentucky Derby. On that occasion he met Carroll in the Maryland Book Shop. He made a horse bet on that occasion and thought he gave a check to Carroll to cover it.

These transactions become important only to show the relation of Carroll to the conduct of the business. As is true of most horse players, his choice was bad—his horse did not win, and there was no "pay-off." If the bettor did give the check to Carroll, considering the manner in which the Maryland Book Shop business was handled, it is reasonable to assume that it was endorsed and turned over to Mooney and went through his account. His next meeting was in connection with the "pay-off" of the Kentucky Derby bet which had not been recorded.

The facts surrounding this transaction are that a group of the witness's associates made up a pool for the purpose of betting on a horse in the Derby. He called the Maryland Book Shop and attempted to place his bet, but before it was recorded, or the necessary information was given, the telephone connection was broken and he was not successful thereafter in making contact. The horse of their choice won and the witness found himself in a very embarrassing situation. His associates were demanding the "pay-off." He went to the Maryland Book Shop where he sought and found Carroll. He explained his situation to Carroll, who told him that he had made no bet and of course, was not entitled to be paid; that it was not his responsibility and that he had no authority to make payment under any circumstances.

However, after further discussion, Carroll said the bettor was always right, and that he would see what could be done. After a conference with someone

out of the presence of the witness, Carroll returned with two checks—one for $900 and one for $1200. One of the checks, the evidence does not show which one, was signed by Carroll and the other by Mooney.

There was no charge in the indictment of failure to report this payment, and it of itself could not have been the basis for a verdict of guilty. The evidence was admitted solely for the purpose of showing relation to the business. Even if it had been among the items specified in the indictment, there was no evidence that it was "gains, profits, and income" to the witness. In fact, the evidence shows that the money for the bet was supplied by numerous persons, and naturally the winnings would be distributed among them, and all concerned apparently so understood.

All of the returns required by law, such as income tax returns, unemployment compensation and old age annuity returns and reports (except 1099 and 1096 involved here) were made by Mooney for the Maryland Book Shop and by Michael Grady for the Hawthorne Book Shop. Carroll did not sign any such returns, and there is no evidence that he had access to the records upon which such returns were based.

The evidence does show that for the purpose of a check of his income tax returns by the Collector, Carroll did produce certain records of the Maryland and Hawthorne Book Shops, and that such records revealed that most of his income was derived from the operation of such establishments.

█ Based upon the whole record, I think the conclusion is inescapable that Carroll was a partner in each of the establishments. But the fact that he was a partner and derived his income from their operation would not of itself render him liable for failure to make the reports required by Section 147.

If every person who is a partner in a business, but who has no actual control over the records and the conduct of the ordinary daily affairs of the business is to be held liable under this statute for failing to make report of payments to all persons who may have earned a profit, or who may become entitled to money within the definition of the statute, then there would literally be hundreds of thousands of persons subject to criminal prosecution who actually had no knowledge or information or responsibility for the actual conduct of a business.

If such a construction is to be placed upon the statute, then many persons would be in grave danger of facing criminal prosecution for failure to file the reports called for. Mooney and Grady are the men who made the payments and who would be liable under the law for failing to make the report. This fact was well known to the authorities at the time the investigation was conducted and the indictment returned, but no indictment was returned against them. The Government "caught the wrong pig by the ear."

The statute says "All persons * * * making payment to another person, * * *" shall be required to file the return. There is no evidence that Carroll made payments to any one, except the two persons, Ryan and the other which has been fully discussed heretofore. The Government's evidence shows that during 1950 one of its revenue agents discussed the question of filing returns, and he was told by Carroll that to do so would drive his business away. There is no evidence that I recall concerning any conversation relative to the filing of such returns prior to 1950 and that was after the expiration date for filing the 1949 return.

At the close of the evidence on behalf of the Government, the defendant offered a motion for judgment of acquittal, which was by the court overruled. Thereafter defendant elected not to offer any evidence and refiled his motion for judgment of acquittal which was by the court taken under consideration, and the case was submitted to the jury.

Thereafter, and within due time, the defendant filed motions for judgment of

216

acquittal and for new trial and motion in arrest of judgment.

██ It is my conclusion after a careful study of the evidence as I have reviewed it here, and a further careful study of the statute and regulations, that the facts are insufficient to sustain a conviction upon the offense charged, and that the Motion for Judgment of Acquittal taken under consideration by the court at the close of the evidence should be, and it is hereby sustained and the defendant is discharged.